DECISION AND JUDGMENT ENTRY
{¶ 1} After a jury trial in the Washington County juvenile court, Bryan Christopher Sturm appeals from a finding of delinquency as a serious youthful offender on two counts of murder. Sturm contends that the trial court erred in denying his motion to suppress the statements he made during an interview inside a police vehicle since he was not advised of his Miranda rights. Because the interview took place in an unmarked police car with Sturm's father present initially, and the detectives clearly told Sturm he was not under arrest, he did not have to answer questions and was free to leave at any time, we conclude Sturm was not in custody at the time of the interview. Accordingly, the detectives were not required to advise him of his Miranda rights. The trial court did not err in denying his motion to suppress.
 {¶ 2} Second, Sturm contends the judgment finding him delinquent of two counts of murder with gun specifications was against the manifest weight of the evidence. Because the record indicates Sturm confessed to the crimes, knew details about the crimes that only the shooter could know, and behaved in a manner consistent with guilt immediately following the shootings, we conclude that the State has presented substantial evidence that would convince a rational jury of Sturm's guilt beyond a reasonable doubt.
 {¶ 3} Third, Sturm contends that the court improperly admitted character evidence of prior "bad acts", i.e., he became violent when he inhaled gasoline. By failing to object to this testimony at trial, Sturm has waived this issue on appeal unless it rises to the level of plain error. Because the admission of this evidence was presented to establish why the investigation shifted from the initial suspect to Sturm, rather than to show Sturm acted in conformity with his character, it doesn't amount to plain error.
 {¶ 4} Fourth, Sturm contends that the trial court improperly admitted hearsay testimony from Detective Warden concerning statements made by Sturm's mother. While Detective Warden improperly relayed the mother's statement that Sturm had huffed gas and gone to his grandmother's house, this same evidence was properly admitted through other means. Because the hearsay was cumulative evidence, its admission was not prejudicial.
 {¶ 5} Fifth, Sturm contends that the trial court abused its discretion in finding that a serious youthful offender disposition was appropriate. The juvenile court considered all of the appropriate factors in the statute, the nature of the crimes, and Sturm's lack of remorse when it concluded his remaining time in juvenile detention will not rehabilitate him. The juvenile court did not act in an unreasonable, arbitrary, or unconscionable manner when it imposed a serious youthful offender disposition.
 {¶ 6} Sixth, Sturm contends the trial court's imposition of consecutive sentences and a sentence exceeding the statutory minimum was unconstitutional because it required additional judicial fact finding that violated his right to a jury trial. However, the juvenile court's findings under the statute were merely discretionary sentencing factors to be considered by the trial judge and applied to the range of potential punishment that was determined by the jury's verdict.
 {¶ 7} Seventh, Sturm contends that he was denied effective assistance of counsel. Because we find no deficiency and/or a lack of prejudice resulting from counsel's performance, we reject this contention.
 {¶ 8} Eighth, Sturm contends that the Washington County Juvenile Court violated his right against cruel and unusual punishment when it set bail at one million dollars and placed him in a detention facility where he was isolated from other youths for up to twenty-three hours per day. Based on the nature of the charges against Sturm and his history as an inhalant abuser, neither the juvenile court's bail nor the detention center's decision to isolate him violate Sturm's right against cruel and unusual punishment. We also conclude that Ohio's serious youthful offender dispositional sentencing scheme does not violate Sturm's right against cruel and unusual punishment because the penalties provided are not so grossly disproportionate to the offenses that they shock a reasonable person.
 {¶ 9} Finally, Sturm contends that Ohio's serious youthful offender law violates a juvenile's right to due process as guaranteed by the federal and Ohio Constitutions. We conclude that Ohio's serious youthful offender law is constitutional because it does not target very young offenders nor does it impermissibly treat juveniles as adults. It reserves adult punishment for serious offenders who are not capable of rehabilitation within the juvenile system. Only after a juvenile is at least 14 years-old and has engaged in further serious wrong doing can the court impose the adult sentence.
 I. Facts {¶ 10} The State of Ohio filed a complaint against Sturm alleging him to be delinquent of two counts of aggravated murder with firearm specifications. The complaint stemmed from a double homicide at the home of Sturm's grandmother, Nancy Tidd. The victims, Nancy Tidd and Emma Tidd (Sturm's aunt), were both found sitting in the living room with gunshot wounds to the head. Autopsy results revealed that in addition to the gunshot wound, Nancy Tidd had a large laceration on the top left side of her head. Police believe this injury was caused by the butt end of the .410 shotgun that was used during the commission of the homicides.
 {¶ 11} The investigation initially focused on Nancy Tidd's live-in boyfriend, Frank Russell. Detectives placed Russell in an unmarked car at the scene and questioned him about the murders. However, Russell explained that he left for work that day at around 2:45 p.m. He stated he received a call at 4:30 p.m. from Nancy, who informed him that Sturm was at the home. Nancy also told Russell that she believed Sturm had been "huffing" gasoline because she could smell it, but that he seemed "alright." Russell stated that he called home throughout the evening to check on Nancy, as he normally does, but no one answered the phone. Just before 9:00 p.m. Russell stated that he had become worried and told his foreman that he needed to leave work. Following this explanation, Russell ceased being a suspect and the detectives permitted him to go into the residence. Once inside, Russell pointed out that the hinges had been removed from the gun cabinet.
 {¶ 12} Detective Warden arrived at the crime scene and received a briefing. He learned that the victims were in a relaxed state when shot and that it appeared a .410 shotgun had been used in the commission of the crime. Another officer, Detective Kapple, suggested they locate Sturm because of the report that he "huffed" gasoline. Detective Warden was to locate and interview Sturm.
 {¶ 13} As the investigators were preparing to leave, another detective approached and informed them that a caller named Rodney West had provided additional information. West had reported that as he was driving home earlier that evening, he picked up a boy walking along State Route 530. The boy told West his name was Chris Sturm and he asked for a ride to Lower Salem. West stated the boy was wearing jeans and shoes, but no shirt, hat or gloves. West drove the boy to Lower Salem and dropped him off at an old abandoned store with apartments above it, where the boy said he lived. Later that evening, upon learning that two women had been shot and that police were looking for the grandson, Chris Sturm, West called the Sheriffs department and relayed the information he had. In light of this new report, the detectives first went to interview West at his residence and then proceeded to Sturm's home.
 {¶ 14} At 11:35 p.m. the detectives arrived at Sturm's home in an unmarked car, accompanied by a marked cruiser. Detective Warden initially spoke with Sturm's father and informed him of the homicides and asked to speak with Sturm. Detective Warden and Sturm's father were acquainted, having grown up together. Sturm's father gave Detective Warden permission to speak with Sturm but asked to be present. After Warden agreed, Sturm's father introduced Warden as a detective with the Sheriffs office and they all proceeded to the unmarked cruiser. Detective Warden was seated in the front driver's side; Sturm was seated in the front passenger side; Sturm's father was seated in the backseat behind Sturm; and another officer was seated in the back seat behind Detective Warden.
 {¶ 15} Detective Warden told Sturm, in his father's presence, that he was not under arrest, did not have to speak with them, and that he could leave at any time. Sturm responded that he understood. Detective Warden initially began questioning Sturm by asking him what he had done that day. Sturm responded with a narrative, making some statements that Detective Warden knew were false. Sturm told Detective Warden that he woke up around 1:00 p.m. that day, got dressed and started to walk to school, but decided not to go. Instead, he went back home and "huffed" gasoline for half an hour to an hour. Then, his stepbrother Matt gave him a ride to his grandmother's house, where he fell asleep until around 3:20 p.m. Sturm stated that when he woke up, he asked and received permission from his grandmother to take the .410 shotgun in the backyard to target practice. Sturm stated he took the gun into the backyard, fired two shots at a beer can, went back inside and got into an argument with his grandmother. Sturm stated he put the gun back in the corner and called his uncle, Brad Russell, for a ride home. Sturm stated that when he got home, he took a shower, washed his jeans and watched television.
 {¶ 16} Detective Warden then asked a series of follow-up questions; based upon Sturm's responses, Detective Warden was convinced Sturm was not telling the truth. Specifically, Detective Warden knew that Sturm had gotten a ride home with Rodney West, not Brad Russell. At that point, Detective Warden asked Sturm's father to exit the vehicle so he could speak with him. Outside the vehicle, Detective Warden told Sturm's father that he knew Sturm was lying and told him about the information they had received from Rodney West. Sturm's father was upset and asked Detective Warden if he should get an attorney. Detective Warden did not answer the father's question, but instead responded that he needed to know the truth. In response, Sturm's father said "Mark, you go ahead and talk to him, but be good to him." Sturm's father then walked towards the house and Detective Warden got back into the vehicle.
 {¶ 17} When Detective Warden re-entered the vehicle, he asked Sturm again about his ride home from his grandmother's house, giving Sturm an opportunity to tell the truth. However, Sturm again stated that his uncle, Brad Russell gave him a ride home. Detective Warden told Sturm that he was lying and that Rodney West had picked him up and given him a ride home. He then asked Sturm, "Is it a possibility that the weapon could have accidentally gone off, striking your aunt and your grandmother?" Again, Sturm denied this suggestion.
 {¶ 18} Detective Warden then asked Sturm "What's the biggest thing that you're afraid of right now in this situation?" Sturm responded that "I just don't want my mother and father to know what I have done." At that point, Sturm stated that he shot his aunt accidentally and shot his grandmother because she had been "putting him down."
 {¶ 19} Sturm then went into a more detailed explanation, stating that his grandmother had given him permission to take the weapon out. When he came back in, his grandmother started putting him down. Sturm stated that he pulled the weapon up to shoot his grandmother and his aunt Emma reached out and grabbed the weapon. Sturm stated that when he went to fire, he accidentally struck his aunt Emma in the side of the head. Sturm then stated that he accidentally discharged the weapon into the wall behind his grandmother, but then reloaded the gun and shot his grandmother in the side of the neck. He then stated that he kicked the shells into the kitchen, put the gun in the laundry room and exited out the back of the residence into the woods. When he started to "sober up," he puked. His shirt had burrs in it so he took his shirt off and threw it down. West picked him up and gave him a ride home. When he got there, he washed his jeans and took a shower. After Detective Warden inquired about the reason for doing this, Sturm said that he was trying to get rid of any gunshot residue.
 {¶ 20} At that point, Detective Warden read Sturm his Miranda rights and after obtaining a written waiver, he tape recorded Sturm's statement. After Warden turned the tape on, the following conversation began:
 "MW: Ok. (unintelligible) okay, the time now is 12:19 a.m. Uhh, I am sitting here talking to Chris Sturm. Chris, prior to talking to you I informed you that, first that you were not under arrest, didn't I?
 CS: Uh, huh.
 MW: I also informed you that you could leave at any time. Correct?
 CS: (unintelligible)
 MW: Ok. Uhh, you had, you just told me that you were involved with the murder of your grandma and Aunt.
 CS: Yea."
 {¶ 21} Sturm essentially repeated the earlier version of events. After taping the statement, Detective Warden informed Sturm's father that Sturm had confessed. Then Sturm was permitted to see his father. The detectives took various photographs, seized several items from the residence, walked Sturm back down to the unmarked cruiser and, according to Detective Warden, took him into custody.
 {¶ 22} Based upon a complaint alleging Bryan Christopher Sturm was delinquent by virtue of two counts of aggravated murder with firearm specifications, the juvenile court conducted a detention hearing the same day. The court ordered Sturm to remain in detention pending further hearings. The State of Ohio filed a Notice of Intent to Pursue a Serious Youthful Offender Status, and the grand jury subsequently indicted Sturm on two counts of aggravated murder, each with a firearm specification. Sturm denied all counts contained in the indictment. The court set bond at one million dollars and denied Sturm's request to be released into the general population at the Washington County Juvenile Center.
 {¶ 23} Sturm's counsel filed multiple pre-trial motions, including a motion to suppress. After the court denied Sturm's motion, the matter proceeded to trial where the State introduced Sturm's statements and many of the facts mentioned above.
 {¶ 24} In its verdict, the jury found Sturm delinquent of two counts of murder, along with each firearm specification. The court imposed a "blended sentence": the traditional juvenile disposition, committing Sturm to the Department of Youth Services until age twenty-one and two consecutive terms of fifteen years to life in an adult prison for each count of murder. The court stayed the adult portion of the sentence pending successful completion of the juvenile disposition.
 {¶ 25} Sturm filed this appeal, asserting the following assignments error:
 I. THE JUVENILE COURT ERRED WHEN IT DENIED BRYAN CHRISTOPHER STURM'S MOTION TO SUPPRESS THE STATEMENTS HE MADE DURING A CUSTODIAL INTERROGATION BECAUSE THOSE STATEMENTS WERE ELICITED IN VIOLATION OF HIS CONSTITUTION (SIC) RIGHT AGAINST SELF-INCRIMINATION.
 II. THE TRIAL COURT VIOLATED BRYAN CHRISTOPHER STURM'S RIGHT TO DUE PROCESS UNDER THE FIFTH AND
 FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION WHEN IT ADJUDICATED HIM DELINQUENT OF TWO COUNTS OF MURDER WITH GUN SPECIFICATIONS WHEN THAT FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 III. THE JUVENILE COURT VIOLATED BRYAN CHRISTOPHER STURM'S RIGHT TO DUE PROCESS BY ADMITTING CHARACTER EVIDENCE IN VIOLATION OF OHIO RULES OF EVIDENCE 401, 402, 403, AND 404, THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 IV. THE JUVENILE COURT VIOLATED BRYAN CHRISTOPHER STURM'S RIGHT TO DUE PROCESS BY ADMITTING HEARSAY EVIDENCE IN VIOLATION OF OHIO RULES OF EVIDENCE 801 AND 802, THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 V. THE JUVENILE COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT THERE WAS A NECESSITY FOR A SERIOUS YOUTHFUL OFFENDER DISPOSITIONAL SENTENCE UPON BRYAN CHRISTOPHER STURM.
 VI. THE TRIAL COURT ERRED IN SENTENCING BRYAN CHRISTOPHER STURM TO CONSECUTIVE TERMS IN AN ADULT PRISON THEREBY DENYING HIM DUE PROCESS AS PROVIDED FOR BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 VII. BRYAN CHRISTOPHER STURM WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.
 VIII. THE TRIAL COURT ERRED WHEN IT IMPOSED A TERM OF INCARCERATION THAT EXCEEDED THE MINIMUM TERM OF INCARCERATION. THE SERIOUS YOUTHFUL OFFENDER SENTENCE WAS IMPROPERLY BASED ON FACTS THAT WERE NOT FOUND BY THE JURY, IN CONTRAVENTION OF BLAKELY V. WASHINGTON (2004), 542 U.S. 296.
 IX. WASHINGTON COUNTY'S JUVENILE COURT AND DETENTION FACILITY AND OHIO'S SERIOUS YOUTHFUL OFFENDER DISPOSITIONAL SENTENCING SCHEME, R.C. 2152.021, R.C. 2152.11, R.C. 2152.13, AND R.C. 2152.14, VIOLATES A JUVENILE'S RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT AND VIOLATED BRYAN CHRISTOPHER STURM'S RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT AS APPLIED AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 9 OF THE OHIO CONSTITUTION.
 X. OHIO'S SERIOUS YOUTHFUL OFFENDER LAW, R.C.2152.021, R.C. 2152. 11, R.C. 2152.13 AND R.C.2152.14 VIOLATES A JUVENILE'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 II. Motion to Suppress {¶ 26} In his first assignment of error, Sturm asserts that the juvenile court should have suppressed his statements to Detective Warden because they occurred during custodial interrogation and in the absence of Miranda warnings in violation of his constitutional right against self incrimination.
 {¶ 27} Appellate review of a trial court's decision regarding a motion to suppress evidence involves mixed questions of law and fact. State v.Long (1998), 127 Ohio App.3d 328, 332, 713 N.E.2d 1, 3. In a motion to suppress, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and evaluate witness credibility. State v. Brooks, 75 Ohio St.3d 148, 154,1996-Ohio-134, 661 N.E.2d 1030. Accordingly, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Landrum (2000), 137 Ohio App.3d 718, 722,739 N.E.2d 1159. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard. Ornelas v.United States (1996), 517 U.S. 690, 699, 116 S.Ct. 1657,134 L.Ed.2d 911; Landrum, supra.
 {¶ 28} In support of his assertion that the juvenile court should have granted his motion to suppress, Sturm argues that he was in custody when he was questioned, that he was subjected to a custodial interrogation before he was advised of his Miranda rights, and that he did not knowingly, voluntarily, and intelligently waive his Miranda rights. He also contends his confession to the Washington County Sheriff's Detective was so unreliable that it should not have been admitted into evidence. The State disagrees, arguing because Sturm was not in custody during the questioning, the officers were not required to read him theMiranda warning.
 A. Custody {¶ 29} The primary issue under this assignment of error is whether Sturm was subjected to custodial interrogation. Miranda defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v.Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602; see, also, Stansbury v.California (1994), 511 U.S. 318, 114 S.Ct. 1526, and Oregon v.Mathiason (1977), 429 U.S. 492, 495, 97 S.Ct. 711. In Oregon v.Mathiason, the court stated that the Miranda protection attaches only where there has been such a restriction on a person's freedom as to render him in "custody."
 {¶ 30} The question of whether an individual is "in custody" is a mixed question of law and fact entitled to independent review. SeeThompson v. Keohane (1995), 516 U.S. 99, 116 S.Ct. 457. In deciding whether the individual was in custody, the reviewing court focuses on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 320; see, also, Berkemer v.McCarty (1984), 468 U.S. 420, 442, 104 S.Ct. 3138 (stating that the relevant inquiry is how a reasonable person in the individual's position would have understood the situation). See, also, State v. Farris,109 Ohio St.3d 519, 2006-Ohio-3255, ¶ 14 (stating the "only relevant inquiry". . . is "how a reasonable man in the suspects position would have understood his situation.").
 {¶ 31} The reviewing court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v.Beheler (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517 (quoting Oregon v.Mathiason). "[T]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings." Minnesota v. Murphy (1984), 465 U.S. 420, 431,104 S.Ct. 1136, 1144, citing Beckworth v. U.S. (1976), 425 U.S. 341,96 S.Ct. 1612.
 {¶ 32} The trial court found the following facts in support of its conclusion that Sturm was not in custody when he was interviewed by Detective Warden. First, the officers interviewed Sturm in an unmarked police car in front of Sturm's residence. This vehicle was indistinguishable from a regular passenger vehicle, except for the presence of a small police radio, which was not turned on during the interview. Also, the entire passenger compartment of the vehicle was open and all four doors on the vehicle had working door handles. Second, the officers obtained permission from Sturm's father before questioning Sturm. Third, Sturm's father sat in the unmarked car with him for the first portion of the interview. Fourth, before any questioning began, Detective Warden told Sturm that he was not under arrest, that he was free to leave at any time, and that he did not have to speak with the officers. Sturm responded that he understood.
 {¶ 33} Based on these findings, which are supported by the record, the trial court did not err in concluding that Sturm was not in custody at the time of the questioning.
 {¶ 34} In State v. Boyd, Washington App. 02CA744, 2003-Ohio-983, unreported, at paragraph 9, we stated:
 [w]hen determining whether a custodial interrogation has occurred, the relevant inquiry is whether a reasonable person in the defendant's position would have believed, under the totality of the circumstances, that he was not free to leave. Berkemer v. McCarty (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317. When reviewing the totality of the circumstances, courts should consider, the "age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Slagle (1992), 65 Ohio St.3d 597, 600, 605 N.E.2d 916. See, also, State v. Barker (1978), 53 Ohio St.2d 135, 372 N.E.2d 1324, paragraph two of the syllabus.
 {¶ 35} When viewing the totality of the circumstances, a reasonable juvenile in Sturm's position would not have believed that he or she was in custody at the time of the interview. Although Sturm was young, he had prior experience with police questioning. Officers from the Washington County Sheriff's Office had questioned Sturm about an allegation of sexual misconduct only a few weeks before this incident. Furthermore, Sturm's high school teacher testified at the suppression hearing that, in her opinion, Sturm has a "high IQ" and would have been able to understand the officers when they told him that he was not under arrest, that he did not have to answer their questions, and that he was free to leave at any time. Therefore, despite his young age, the record indicates that Sturm possessed a high enough level of intelligence and maturity to understand the officers. His recent prior experience with the sheriffs office bolsters that conclusion.
 {¶ 36} The record indicates that the interview took place in two separate sessions: one with Sturm's father present, and one without him. However, each of these sessions were of relatively short duration, and there is no evidence from the record that would describe the interviews as harsh or intense. Additionally, there is no evidence that Sturm suffered from any physical deprivation or mistreatment during the questioning, nor was he threatened or induced to confess.
 {¶ 37} When viewing the totality of the circumstances, a reasonable juvenile in Sturm's position would not have believed that he or she was in custody at the time of the interview. Based on our review of the record, we conclude that Sturm was not in custody during his questioning inside an unmarked police car. Because Sturm was not in custody, Detective Warden was not required to advise him of his Miranda warnings. Accordingly, we do not need to address whether Sturm knowingly and voluntarily waived his Miranda rights during the second investigation because this issue is now moot.
 B. Subjective Intention {¶ 38} Sturm also contends that Detective Warden should have been required to answer a question posed to him by Sturm's counsel at the suppression hearing, i.e. what would Warden have done if Sturm had exited the car and run away? At the hearing, the State objected to the question as speculative, and the court sustained the objection.
 {¶ 39} By posing this question at the suppression hearing, Sturm's counsel apparently sought to learn whether the officer thought Sturm was in custody. We have repeatedly held that, "[t]he subjective views of the interviewing officer and the suspect are immaterial to the determination of whether law enforcement conducts a custodial interrogation."Boyd, Washington App. No. 02CA744, 2003-Ohio-983, at paragraph 9, citingStansbury v. California (1994), 511 U.S. 318, 323, 114 S.Ct. 1526. The test is objective as we stated above. Therefore, Detective Warden's subjective view of the situation was not relevant to the inquiry. Since the answer to the question was irrelevant, the court properly prohibited the answer.
 C. Reliability {¶ 40} Sturm further contends that his statement should be suppressed because some factual inconsistencies between the confession and the evidence gathered at the crime scene render the confession unreliable. He also argues that the interrogation techniques used by the officers were geared towards adults rather than juveniles. We reject these contentions based upon the lack of citation to authority and the non-coercive nature of the interview as indicated by the record.
 {¶ 41} In Sturm's confession, he stated that he shot his aunt "accidentally" after he struggled with her for control of the shotgun. However, the crime scene clearly showed that no struggle took place. In fact, the notion of an "accidental" shooting had first been advanced by Detective Warden when he suggested to Sturm that the shooting might have been an accident. Sturm apparently accepted this explanation to minimize his culpability in the shooting. This admission placed Sturm in the home at the time of the deaths, holding the weapon that inflicted the fatal shots. Sturm then admitted that after shooting his aunt, he intentionally shot and killed his grandmother, and he described how he committed the offense.
 {¶ 42} Normally, unreliability is related to voluntariness and becomes an issue where coercion is involved. There is no evidence of any coercion in this record, including the interrogation techniques. Simply because Sturm's confession does not exactly mirror the evidence, does not render it unreliable. In his admission, Sturm attempted to minimize his culpability in the crimes by claiming they were accidental. The minor factual inconsistencies between Sturm's confession and the evidence found at the crime scene do not render his confession inadmissible. Therefore, we overrule Sturm's first assignment of error.
 III. Manifest Weight of the Evidence {¶ 43} Sturm contends that the trial court erred in adjudicating him delinquent because the judgment was against the manifest weight of the evidence. When considering whether a conviction is against the manifest weight of the evidence, our role is to determine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction." State v. Getsy (1998),84 Ohio St.3d 180, 193, 702 N.E.2d 866. We sit, essentially, as a "`thirteenth juror' and [may] disagree with the fact finder's resolution of the conflicting testimony." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting Tibbs v. Florida (1982), 457 U.S. 31,42, 102 S.Ct. 2211, 72 L.Ed.2d 652. We must dutifully examine the entire record, weighing the evidence and considering the credibility of witnesses, but keeping in mind that credibility generally is an issue for the trier of fact to resolve. State v. Thomas (1982),70 Ohio St.2d 79, 80, 434 N.E.2d 1356; State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus. We may reverse the conviction only if it appears that in resolving evidentiary conflicts the fact finder "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Conversely, we will not reverse a conviction if the state presented substantial evidence upon which the trier of fact could reasonably conclude that all essential elements of the offense had been established beyond a reasonable doubt. State v. Eley (1978), 56 Ohio St.2d 169,383 N.E.2d 132, syllabus.
 {¶ 44} After reviewing the record, it is clear that the state presented substantial evidence upon which a rational trier of fact could reasonably conclude that Sturm was delinquent beyond a reasonable doubt. Sturm's confession placed him inside the victims' home at the time of the murders. He confessed to shooting both his aunt and grandmother, and he knew facts and details that only the shooter could know. For example, Sturm knew the location of the victims' fatal wounds and what they were doing when they died. Furthermore, Sturm knew that three .410 slugs had been fired from a .410 shotgun, and he knew the location of the spent shell casings. Sturm also admitted that he unscrewed the hinges of the gun cabinet in order to take possession of the murder weapon, which is consistent with the investigation at the scene.
 {¶ 45} Additionally, Sturm admitted taking actions to destroy forensic evidence that might have been used against him by washing his pants and showering to eliminate any gunshot residue. This evidence negates Sturm's assertion that the evidence is deficient because none of the forensic scientists at the Ohio Bureau of Criminal Investigation were able to find any gunshot residue or DNA linking Sturm to the crime.
 {¶ 46} Sturm's behavior immediately following the shooting is also consistent with guilt. He fled the crime scene and ran along a trail without a shirt for approximately two and one-half miles. He eventually came to a road and asked Rodney West, a passing motorist, to give him a ride to a location other than his home. West testified that Sturm appeared "scared to death."
 {¶ 47} Sturm contends that Nancy Tidd's live-in boyfriend, Frank Russell, committed the murders, and that Sturm merely stumbled across the scene after Russell had committed the acts. However, Russell had a verified alibi, which placed him at his work during the time of the killings.
 {¶ 48} Based on the evidence, including Sturm's confession, we conclude that the trial court's decision is supported by substantial evidence to support a finding of delinquency beyond a reasonable doubt. There is no manifest miscarriage of justice. Accordingly, the trial court's judgment is not against the manifest weight of the evidence.
 IV. Character Evidence {¶ 49} In his third assignment of error, Sturm contends that the court improperly admitted character evidence of prior acts to show that Sturm had a propensity to commit these killings. Our standard of review is the well-recognized rule that the admission of evidence is within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343, paragraph two of the syllabus. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary.Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd. (1992),63 Ohio St.3d 498, 506, 589 N.E.2d 24, 30. When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. In re Jane Doe 1 (1990),57 Ohio St.3d 135, 138, 566 N.E.2d 1181, 1184, citing Berk v. Matthews
(1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308.
 {¶ 50} Evid. R. 404(B) controls the use of other acts evidence and states:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 51} The admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment. State v.Schaim (1992), 65 Ohio St.3d 51, 59, 600 N.E.2d 661, 668. Generally, evidence of other acts is not permissible when offered to show a trait, disposition, or propensity toward the commission of a certain type of crime. State v. Aliff, Lawrence App. No. 99CA8, 2000 WL 378370, at paragraph 10, citing State v. Henderson (1991), 76 Ohio App.3d 290, 293,601 N.E.2d 596. However, under the rule it is admissible for other purposes such as, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 52} Sturm contends that the court improperly permitted Detective Kapple to testify about Sturm's prior acts to show that Sturm had a propensity to commit crimes. Kapple's testimony described a debriefing that occurred at the crime scene while other officers were interviewing Frank Russell. At the debriefing, Kapple gave his opinion that Sturm should be considered a suspect because of information indicating Sturm had a tendency towards violent behavior when he huffed gasoline, and it was common for him to spend time at his grandmother's residence. Kapple also told the officers that the description of the young man that West had picked up earlier matched Sturm.
 {¶ 53} Sturm's trial counsel failed to object to Kapple's testimony at trial. Evid. R. 103(A)(1) provides: "Error may not be predicted upon a ruling which admits . . . evidence unless a substantial right of the party is affected and . . . a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context." Because Sturm failed to raise a character evidence objection at trial, he has waived all but plain error. State v. Loza (1994), 71 Ohio St.3d 61, 75,641 N.E.2d 1082, 1100.
 {¶ 54} Crim. R. 52 allows plain errors to be recognized, stating that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." As defined by the Supreme Court of Ohio, plain error does not exist unless it is clear that but for the error, the jury's verdict would have been otherwise. State v. Moreland (1990), 50 Ohio St.3d 58, 62,552 N.E.2d 894, 899. Importantly, the appellate court should exercise the utmost caution when taking notice of plain error under Crim. R. 52(B), invoking the rule only in exceptional circumstances and only to prevent a miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91,372 N.E.2d 804, third paragraph of the syllabus.
 {¶ 55} We are not convinced that Kapple's statements rise to the level of plain error. The purpose of Kapple's testimony was to show how and why the State's investigation shifted from Frank Russell to Sturm rather than to establish Sturm had a propensity to commit bad acts. Kapple did not allege that Sturm was guilty of criminal misconduct, nor did he mention that Sturm was under investigation for an unrelated felony-level sexual assault. Moreover, assuming that the statements were improper, it does not clearly appear that the outcome of the trial would have been different had the testimony been excluded. Therefore, we conclude that Kapple's testimony did not rise to plain error.
 {¶ 56} Sturm also argues even if this evidence is admissible under Evid. R. 404(B), it should have been excluded under Evid. R. 403 because the danger of unfair prejudice substantially outweighs its probative value. In light of the fact there was no specific objection and Evid. R. 403's clear preference for the admissibility of relevant evidence, we reject this contention.
 {¶ 57} Sturm further contends that the trial court erred when it permitted a portion of Detective Warden's testimony. Warden testified that a stepbrother told Sturm's mother that he could not control Sturm because Sturm had been huffing gasoline. Sturm's counsel objected to this testimony as improper hearsay evidence, but did not argue that it was improper character evidence. Because Sturm's counsel failed to object to this testimony as improper character evidence at trial, he has waived that issue for purposes of appeal. See Evid. R. 103(A)(1). However, we will address the hearsay contention regarding this testimony in Sturm's fourth assignment of error below.
 {¶ 58} Due to its prejudicial nature, Sturm also contends that the trial court erred by admitting the portion of his interview where he states that he was angry with his grandmother for insulting him and suggesting that people referred to him as a rapist. Before admitting this section of Sturm's confession, the trial court discussed the matter with counsel for both parties and reached a mutual agreement that the trial court would give a specific limiting instruction to the jury advising it that Sturm had "never been charged nor convicted of rape, nor has he ever been found delinquent by reason of rape." Because the trial court gave this limiting instruction and juries are presumed to follow the court's instruction, no unfair prejudice resulted from the admission of these statements. Sturm's third assignment of error is meritless.
 V. Hearsay {¶ 59} In his fourth assignment of error, Sturm contends that the trial court improperly admitted the hearsay testimony from Detective Warden. During his testimony, the State asked Warden whether he had corroborated any of the details that Sturm had provided in his confession. Warden stated that he learned from Sturm's mother that a stepbrother called her to indicate he "cannot control Chris because he is into the gas." Warden also stated that Sturm's mother told the stepbrother to take Sturm to his grandmother's house. The trial court admitted Warden's testimony over a hearsay objection.
 {¶ 60} Generally, we will not disturb the trial court's decision to admit or exclude relevant evidence absent an abuse of discretion.State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus. However, a trial court's discretion to admit or exclude relevant evidence does not include the discretion to admit hearsay; Evid. R. 802 mandates the exclusion of hearsay unless an exception to the rule applies. State v. Barney (June 7, 1999), Meigs App. No. 97CA12,1999 WL 378755, at 4. Accordingly, we undertake a de novo review of the trial court's interpretation of Evid. R. 801. Id.
 {¶ 61} We must first determine whether Warden's statements constitute hearsay. Evid. R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Here, Warden's statements were made in response to a question asking whether he had corroborated any of the statements Sturm made in his confession. Instead of simply indicating "yes" and indicating what he did, Warden relayed statements made by Sturm's mother. Warden explained that he contacted Sturm's mother and that she had sent Sturm to his grandmother's house because he had been huffing gasoline. The purpose of Warden's testimony was to corroborate Sturm's statements from his confession that he had been to his grandmother's house and that he had huffed gasoline that day.
 {¶ 62} We conclude that Warden's testimony constitutes hearsay because it was offered to prove the truth of the matter asserted: that Sturm had, in fact, actually huffed gasoline and gone to his grandmother's house. However, these facts were already in evidence as part of Sturm's confession. Therefore, the admission of this cumulative evidence was not so prejudicial as to be reversible error.
 VI. Serious Youthful Offender {¶ 63} In the fifth assignment of error Sturm contends that the trial court abused its discretion in finding that a serious youthful offender disposition was appropriate. "Ohio has long recognized that juvenile proceedings are not criminal in nature and the juvenile system must focus on the child's welfare." State v. Penrod (1989),62 Ohio App.3d 720, 722, 577 N.E.2d 424. While the general objective of the juvenile system is rehabilitation rather than punishment, the juvenile justice system may contain punitive elements. In re Woodson (1994),98 Ohio App.3d 678, 682, 649 N.E.2d 320. "Some juveniles learn only through detention, which is itself a means and method of education and rehabilitation." In re Samkas (1992), 80 Ohio App.3d 240, 244,608 N.E.2d 1172. "The order of disposition in a juvenile case is a matter within the court's discretion." State v. Matha (1995),107 Ohio App.3d 756, 760, 669 N.E.2d 504. We will reverse the juvenile court's judgment only if it abused that discretion. "Abuse of discretion" is more than an error of law or judgment; it implies the court's attitude was unreasonable, arbitrary, or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157, 404 N.E.2d 144.
 {¶ 64} Because Sturm was charged with aggravated murder while being twelve years old, he was subject to discretionary, rather than mandatory, serious youthful offender status. Accordingly, he faced the potential for a "blended sentence" whereby the juvenile court may order both a juvenile disposition and an adult sentence. The adult sentence is stayed pending successful completion of the juvenile disposition and only imposed upon a violation of set conditions or institutional rules in such a way as to impede the juvenile rehabilitation. See Giannelli, Ohio Juvenile Law (2005 Ed.), Section 5:2.
 {¶ 65} R.C. 2152.13 sets forth the procedures for determining whether a juvenile may be deemed a serious youthful offender. For discretionary serious youth offender status, the juvenile court is required to make the following finding under R.C. 2152.13(D)(2)(a)(i): "[G]iven the nature and circumstances of the violation and the history of the child, the length of time, level of security, and types of programming and resources available in the juvenile system alone are not adequate to provide the juvenile court with a reasonable expectation that the purposes set forth in section 2152.01 of the Revised Code will be met[.]" If the juvenile court finds these aspects of the juvenile system inadequate to provide a reasonable expectation of rehabilitation, the trial court may sentence the child as if the child were an adult. See R.C. 2152.13(D)(1)(a).
 {¶ 66} At the dispositional hearing, Sturm presented the testimony of two of his former teachers, Tanya Robinson and Janet Huck. Both teachers testified Sturm was respectful, a good student when in class, and other children like him. Ms. Robinson testified that Sturm always told her stories to get her attention. Sturm also presented the testimony of his basketball coach, James Legraen, who testified that Sturm was a "good kid", player, and teammate.
 {¶ 67} Brian Hesson, a case manager at the Washington County Juvenile Center, testified that Sturm did not have any incidents reports while held in detention, and he did not cause any significant problems. Hesson further testified that Sturm was one of the better behaved children in detention.
 {¶ 68} Dr. Jolie Brams, a child psychologist, also testified as an expert witness on child psychology and rehabilitation of children. She testified that Sturm suffers from untreated ADHD, a genetic propensity for substance abuse, depression, learning disabilities, and a variety of family problems. Dr. Brams stated that Sturm was born into a family where the children were fed, but basically unsupervised. She testified that Sturm is not cold, uncaring, or calculating, nor does he show any characteristics of a sociopath or psychopath. Dr. Brams concluded that, in her opinion, Sturm can be rehabilitated in the juvenile justice system, and she believes he has time and capacity to learn and the desire to change.
 {¶ 69} In its decision, the court stated R.C. 2151.02 requires it to consider "the protection of the public as well as the rehabilitation of the offender." The court reasoned that despite the fact that Sturm suffers from ADHD, depression, and substance abuse, he still must be responsible for his actions. The court also noted that it was especially troubled that Sturm indicated to Dr. Brams that he missed his grandmother "a little," and that he "feels bad, a little" about her death. Furthermore, the court stated that Sturm had also been found to be a delinquent child for having committed the offense of Gross Sexual Imposition from an incident in which he forced himself sexually upon his fifteen-year-old cousin after consuming alcohol.
 {¶ 70} The trial court considered Dr. Brams' opinion that Sturm could be rehabilitated but rejected it. The court concluded that it was not convinced that the programming and resources available from youth services are adequate to treat and rehabilitate Sturm.
 {¶ 71} We conclude that the trial court did not abuse its discretion in imposing a serious youthful offender dispositional sentence upon Sturm. The court considered all of the factors in R.C. 2152.13(D)(2)(a)(i) and concluded that based on the nature of the crimes and Sturm's apparent lack of remorse, the remaining eight years that he will spend in the Department of Youth Services will not be enough to rehabilitate him. The court is not required to accept an expert's opinion on the ultimate issue where there is some evidence to support the trial court's decision. Bostic v. Connor (1988), 37 Ohio St.3d 144,148, 524 N.E.2d 881, 886. Here the court apparently rejected Dr. Brams ultimate conclusion because it was based in part on her belief that it was not uncommon for a child to feel little remorse following the death of a family member even when the child had caused the death. The court found this position was not credible. This finding did not amount to an abuse of discretion. Because the record indicates the court evaluated each of the elements contained in the statute, we conclude that the trial court did not abuse its discretion. We overrule Sturm's fifth assignment of error.
 VII. Sentencing {¶ 72} In his sixth assignment of error, Sturm initially contends that the trial court erred in sentencing him to consecutive prison sentences in the adult portion of his sentence because it did not apply R.C. 2929.14(E). We examine this contention along with Sturm's eighth assignment of error in which he contends that the trial court erred in sentencing him to a prison sentence exceeding the minimum term in the adult portion of his sentence. Because State v. Foster,109 Ohio St.3d 1, 845 N.E.2d 470, 2006-Ohio-856 severed the portion of R.C. 2929.14(E) that required the trial court to make specific findings before imposing consecutive sentences, the trial judge was not required to make such findings here. Likewise, the requirement for separate findings concerning more than the minimum sentence were severed byFoster and no longer apply. We overrule both these contentions.
 {¶ 73} In his supplemental brief, Sturm argues that Ohio's serious youthful offender statute is unconstitutional based on the United States Supreme Court's holdings in Apprendi v. New Jersey (2000), 530 U.S. 466,120 S.Ct. 2348, and Blakely v. Washington (2004), 542 U.S. 296,124 S.Ct. 2538 as interpreted by State v. Foster, supra. In Foster, the Court deemed certain provisions of R.C. 2929.14 unconstitutional because they required judicial fact-finding before the imposition of consecutive sentences or a sentence greater than the maximum term authorized by a jury verdict or admission by the defendant. Sturm contends that the reasoning in Foster should be applied to Ohio's discretionary youthful offender statute. He argues Ohio's discretionary youthful offender statute is unconstitutional because it compels the juvenile court, and not the jury, to make the specific findings found in R.C. 2152.13(D)(2)(a)(i) before it can impose a serious youthful offender sentence.
 {¶ 74} This same argument was considered in In re J.B., Butler App. No. CA 2004-09-226, 2005 WL 3610482, which was decided afterBlakely but before Foster. The court in In re J.B. reasoned:
 [a]ppellant's right to a jury trial was not violated due to the juvenile court judge making the finding in R.C. 2152.13(D)(2)(a)(i). The sentence appellant received was derived from the jury's verdict on the murder and child endangering counts, not from any additional fact finding engaged in by the juvenile court. Pursuant to R.C. 2152.11(B)(2) and R.C. 2152.11(E)(2), appellant was subject to a serious youthful offender disposition at the discretion of the juvenile court simply by virtue of the delinquency finding for murder and child endangerment. Therefore, the range of appellant's potential punishment by virtue of the jury verdict alone included the applicable adult punishment set forth in Revised Code Chapter 2929. In making the finding in R.C. 2152.13(D)(2)(a)(i), the court was determining appellant's punishment within the statutorily prescribed range, taking into account the nature and circumstances of the offense, and the security, programming, and resources available in the juvenile system. The court's consideration of those matters did not violate appellant's right to a jury trial. See State v. Combs, Butler App. No. CA2000-03-47, 2005-Ohio-1923, ¶ 59, and State v. Farley, Butler App. No. CA2004-04-085, 2005-Ohio-2367, ¶ 42 (consideration of discretionary sentencing factors by judge did not violate offender's right to jury trial where sentence imposed was within statutorily defined range for offense).
Id. at paragraph 126.
 {¶ 75} We find the reasoning in In re J.B. persuasive and adopt it here. Once the jury found Sturm guilty of murder, he was automatically subject to a blended sentence. The juvenile court's findings in R.C. 2152.13(D)(2)(a)(i) are merely discretionary sentencing factors to be applied to the range of punishment that was solely determined by the jury's verdict. Accordingly, we conclude that Ohio's serious youthful offender statute is not unconstitutional because the range of Sturm's punishment was determined by the jury's verdict.
 VII. Assistance of Counsel {¶ 76} In his seventh assignment of error, Sturm contends that he was denied effective assistance of counsel under the Sixth andFourteenth Amendments to the United States Constitution and Article I, Sections 10
and 16 of the Ohio Constitution. Sturm raises several issues in this assignment of error, arguing counsel was ineffective for 1 ) failing to retain an expert in the field of Miranda waivers and coerced and false confessions, 2) failing to renew his motion for change of venue after jury selection, 3) agreeing to a one million dollar bond, which he argues was the equivalent of no bond, 4) failing to object to certain testimony offered at trial, 5) failing to object to the imposition of a blended sentence, and 6) failing to object to the imposition of consecutive terms of imprisonment.
 {¶ 77} In order to establish ineffective assistance of counsel, Sturm must show that his trial attorney's performance was both deficient and prejudicial. Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989), 42 Ohio St.3d 136,141-142, 538 N.E.2d 373. To be deficient, Sturm must show that his counsel's performance "fell below an objective standard of reasonableness." Strickland at 688. Sturm must also overcome the presumption that the challenged action might be considered sound trial strategy. Id. at 689. In order to show prejudice, Sturm must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the outcome of the proceeding would have been different. Id. at 694.
 {¶ 78} First, Sturm contends that his trial counsel was ineffective because he failed to retain an expert in the field of Miranda waivers and coerced and false confessions. Because we found that Sturm was not in custody and, thus, the detectives were not required to give himMiranda warnings, we conclude that Sturm's counsel was not deficient in failing to obtain an expert.
 {¶ 79} Second, Sturm contends that his trial counsel was ineffective because he failed to renew Sturm's motion for change of venue after jury selection. A review of the record reveals that Sturm's counsel initially filed a motion for change of venue because of the extensive local media coverage concerning the case. In fact, every potential juror except one had heard or seen some media coverage concerning the allegations against Sturm. However, the trial court determined it was possible to select an impartial jury from the juror pool, even if most of the jurors had heard something about the case. Each juror selected stated that he or she could set aside their opinions and listen to the evidence in an impartial manner. Therefore, even if trial counsel had renewed the motion, it would have been denied. Counsel is not required to perform vain acts. Thus, counsel was not deficient in this regard.
 {¶ 80} Third, Sturm contends that his trial counsel was ineffective because he agreed to a one million dollar bond. Because we conclude below that the juvenile court's decision to set bond at one million dollars was reasonable in light of the seriousness and circumstances surrounding the alleged crimes, Sturm cannot demonstrate deficient performance in this regard.
 {¶ 81} Fourth, Sturm contends that his trial counsel was ineffective because he failed to object to a portion of Detective Kapple's testimony, as argued in Sturm's third assignment of error. We concluded the State offered this testimony to show the jury how and why the investigation shifted from Frank Russell to Sturm. The State did not offer Kapple's testimony to show that Sturm had a propensity to commit bad acts and must be guilty of murder. We concluded the trial court did not abuse its discretion in admitting this testimony. Accordingly, Sturm's counsel was not deficient for failing to object to it.
 {¶ 82} Fifth, Sturm contends that his trial counsel was ineffective because he failed to object to the imposition of a blended sentence and consecutive terms of imprisonment. Because we determined the trial court did not err in imposing a blended sentence nor in imposing consecutive sentences, we conclude counsel's failure to object to the sentences was not deficient. Accordingly, we overrule Sturm's seventh assignment of error.
 VIII. Cruel and Unusual Punishment {¶ 83} In his ninth assignment of error, Sturm contends that the Washington County Juvenile Court and the detention facility violated his rights under the Eighth Amendment to the federal constitution and its Ohio counterpart. Specifically, Sturm argues that setting bail at one million dollars, holding him in detention, isolated from other youths up to twenty-three hours a day, and requiring him to be shackled each time he was allowed into the general population amounts to cruel and unusual punishment.
 {¶ 84} As Sturm correctly asserts, R.C. 2152.13(C)(2) provides that a detained juvenile awaiting adjudication upon indictment has the same right to bail as an adult facing identical charges. The Ohio Constitution provides that "[a]ll persons shall be bailable by sufficient sureties, except for a person who is charged with a capital offense where the proof is evident or the presumption great, andexcept for a person who is charged with a felony where the proof isevident or the presumption great and where the person poses asubstantial risk of serious physical harm to any person or to thecommunity." (Emphasis added). O Const, Art. I Sec. 9 Bail; cruel and unusual punishments.
 {¶ 85} Sturm was being detained in connection with two indictments for aggravated murder, in violation of R.C. 2903.01(A), both with firearm specifications. Although aggravated murder may be charged as a capital offense under certain circumstances, Sturm was charged with non-capital aggravated murder, which is a felony. As Ohio's Constitution expressly provides, persons charged with felonies "where the proof is evident orthe presumption great and where the person poses a substantial risk ofserious physical harm to any person or to the community," may be denied bail.
 {¶ 86} Sturm faced two counts of aggravated murder, both with firearm specifications, in connection with the death of two family members. Sturm, by his own account and by the accounts of others, is an inhalant abuser who acts irrationally when he is under their influence. This abuse may have played a role in the commission of the crimes and posed a substantial risk for additional acts of violence. Based upon these facts, the juvenile court could have denied bail completely. Under these circumstances, we do not believe that the juvenile court's setting bail at one million dollars violated Sturm's right against cruel and unusual punishment. Likewise, the court and detention center's decision to keep Sturm separated from the general population, considering the seriousness of the crimes charged and the potential for conflict or injury to Sturm or other detainees, was not unreasonable.
 {¶ 87} Sturm also asserts that Ohio's serious youthful offender dispositional sentencing scheme, composed of R.C. 2152.021, R.C. 2152.11, R.C. 2152.13, and R.C. 2152.14, is violative of the protection against cruel and unusual punishment because it treats children the same as adults. Sturm argues that the scheme is unconstitutional both on its face and in its application. In support of his argument, Sturm citesRoper v. Simmons (2005), 543 U.S. 551, 125 S.Ct. 1183, which held that the Eighth and Fourteenth Amendments of the U.S. Constitution forbid imposition of the death penalty on offenders who were under the age of eighteen when they committed their crimes.
 {¶ 88} Legislative enactments generally enjoy a strong presumption of constitutionality. State v. Collier (1991), 62 Ohio St.3d 267, 269,581 N.E.2d 552, 553. Whenever possible, we construe statutes to be in conformity with the Ohio and United States Constitutions. Id. Moreover, the party challenging a statute as unconstitutional has the burden of proving that assertion beyond a reasonable doubt. Id. A facial attack on the constitutionality of a statute is to be decided by considering the statute without regard to extrinsic facts. Cleveland Gear Co. v.Limbach (1988), 35 Ohio St.3d 229, 231, 520 N.E.2d 188, 191. An "as applied" attack on the constitutionality of a statute is to be decided by considering the facts. The burden is upon the party making the attack to present clear and convincing evidence of a presently existing state of facts that makes the statute unconstitutional when applied to the state of facts. Id., citing Belden v. Union Cent. Life Ins. Co. (1944),143 Ohio St. 329, 55 N.E.2d 629, paragraph six of the syllabus.
 {¶ 89} This same argument was recently considered in In re J.B., supra. The court in In re J.B. commented that "`[c]ases in which cruel and unusual punishments have been found are limited to those [cases] involving sanctions which under the circumstances would be considered shocking to any reasonable person.'" citing McDougle v. Maxwell (1964),1 Ohio St.2d 68, 70, 203 N.E.2d 334. Further, as noted by that court, "[t]he penalty must be so greatly disproportionate to the offense that it shocks the sense of justice of the community." In re J.B., supra, citing State v. Weitbrecht, 86 Ohio St.3d 368, 371, 715 N.E.2d 167,1999-Ohio-113, citing State v. Chaffin (1972), 30 Ohio St.2d 13,282 N.E.2d 46, paragraph three of the syllabus.
 {¶ 90} After a thorough review of the serious youthful offender dispositional sentencing scheme, the court in In re J.B., supra, held that the scheme does not permit cruel and unusual punishment, reasoning that:
 [t]he scheme does not provide for penalties against juveniles so greatly disproportionate to the offenses committed that those penalties shock the sense of justice in the community. As noted above, the scheme prohibits the imposition of the most severe adult punishment. Further, the scheme reserves adult punishment only for serious juvenile offenders not capable of being rehabilitated within the juvenile system. Among juveniles who receive an adult sentence, only those who commit further serious wrongdoing and who are at least 14 years old can be ordered to serve the adult sentence.
In re J.B., Butler App. No. CA 2004-09-226, 2005 WL 3610482, at paragraph 133.
 {¶ 91} We find the reasoning of the Twelfth District to be persuasive and adopt it here. Accordingly, we overrule Sturm's ninth assignment of error.
 IX. Youthful Offender {¶ 92} In his tenth assignment of error, Sturm asserts that Ohio's serious youthful offender law violates a juvenile's right to due process as guaranteed by the Fifth andFourteenth Amendments to the United States Constitution
and Article I, Section 16 of the Ohio Constitution. Sturm argues that Ohio's serious youthful offender law "targets the very young offender, treats the young offender the same as an adult offender, and does not provide for an amenability hearing at the original disposition or at a hearing to determine whether the adult portion of the sentence should be invoked."
 {¶ 93} As noted above, all legislative enactments generally enjoy a strong presumption of constitutionality. State v. Collier (1991),62 Ohio St.3d 267, 269, 581 N.E.2d 552, 553. Whenever possible, we construe statutes to be in conformity with the Ohio and United States Constitutions. Id. Moreover, the party challenging a statute as unconstitutional has the burden of proving that assertion beyond a reasonable doubt. Id.
 {¶ 94} This exact argument was also considered by the Twelfth District Court of Appeals in In re J.B., supra, which held "the serious youthful offender sentencing scheme does not unconstitutionally `target' very young offenders or unconstitutionally treat juveniles as adults." In support of its holding, the J.B. court reasoned:
 [w]hile the scheme does, under certain circumstances, subject juveniles to adult punishment, the statute was crafted to take into account juvenile-adult distinctions. As previously noted, the most severe adult punishments are prohibited by R.C. 2152.13(D)(2)(a)(i). Further, the juvenile court can order adult punishment only after the juvenile court determines pursuant to R.C. 2152.13(D)(2)(a)(i) that the juvenile system alone cannot adequately fulfill the purposes for disposition outlined in R.C. 2152.01(A). Additionally, while a juvenile as young as ten can receive a serious youthful offender disposition, the juvenile court can only invoke the adult punishment if the juvenile is at least 14 years old, and if the juvenile has engaged in further serious wrongdoing. See R.C. 2152.14(E). The court must also determine, after a hearing, that the juvenile offender is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction. See id. Ohio's serious youthful offender statutes take into account juvenile-adult differences and make clear that disposition within the juvenile system, if possible, is the preferred form of punishment and rehabilitation. We find no due process violation.
In re J.B., Butler App. No. CA2004-09-226, 2005 WL 3610482, at paragraph 139.
 {¶ 95} In addressing amenability hearings, the J.B. court further reasoned:
 We also do not find that the lack of an amenability hearing `at the original disposition hearing or at a hearing to determine whether the adult portion of the sentence should be invoked' violates due process. As noted above, the juvenile court must consider, at the time it imposes an adult sentence and at the time it invokes the adult sentence, whether the juvenile system can adequately rehabilitate Sturm. See R.C. 2152.13(D)(2)(a)(i) and R.C. 2152.14(E). Before invoking the adult punishment, the court must hold a full hearing, at which the juvenile could present evidence in favor of remaining within the juvenile system. See R.C. 2152.14(D). We find that the procedures in Ohio's serious youthful offender statutes adequately address due process concerns regarding the serious youthful offender's amenability to the juvenile or adult systems.
In re J.B., Butler App. No. CA2004-09-226, 2005 WL 3610482, at paragraph 140. We also note the serious youthful offender sentencing scheme differentiates between adult and juvenile offenders by prohibiting the imposition of the death penalty and life without parole upon the latter. See R.C. 2153.13(D)(2)(a)(i).
 {¶ 96} In light of the foregoing reasoning, we conclude Sturm has failed to meet his burden of proving that Ohio's serious youthful offender sentencing scheme violates due process. Accordingly, we overrule Sturm's tenth assignment of error.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, J.: Concurs in Judgment and Opinion.
McFarland, J.: Dissents.