JOURNAL ENTRY AND OPINION
{¶ 1} Minor-Appellant Nicholas Wheeler appeals his convictions for aggravated murder and murder. Wheeler assigns the following errors for our review:
 "I. The trial court erred in its judgment which was against the manifest weight of the evidence when it found minor-defendant to be delinquent based upon the complaints of aggravated murder and murder in violation or O.R.C. 2903.01(A) and 2903.02(A)."
 "II. The trial court erred in finding the minor-defendant a serious youthful offender."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} On August 14, 2006, Antonio Anderson was fatally shot in the vicinity of 7211 Clark Avenue in Cleveland, Ohio. Wheeler, born May 19, 1991, was identified as one of the suspects in the homicide and subsequently charged with aggravated murder and murder. On September 27, 2006, the State of Ohio filed a motion to transfer jurisdiction from the juvenile court to the general division of the common pleas court.
 {¶ 4} On January 30, 2007, the trial court found probable cause. The trial court referred Wheeler to the court psychiatric clinic for an evaluation in preparation for an amenability hearing. On March 12, 2007, the trial court found Wheeler amenable to care or rehabilitation within the juvenile court. The trial court also found that the safety of the community may require that the child be subject to adult sanctions.
 {¶ 5} On May 16, 2007, the Cuyahoga County Grand Jury indicted Wheeler on one count each of aggravated murder and murder. Each count had one and three-year firearm *Page 3 
specifications attached. In addition, each count had a serious youth offender specification attached. Wheeler denied the allegations, executed a waiver of his right to a jury trial, and the matter proceeded to a bench trial, which commenced on October 15, 2007.
 Bench Trial {¶ 6} At trial, the State presented the testimony of seven witnesses, including Vanessa Irizarry, who testified that on August 14, 2006, she was driving her boyfriend home when she noticed a young boy standing on the corner of West 72nd Street and Clark Avenue. Irizarry testified that another boy was lying on the ground, while a third boy was standing over him, with a gun pointed at him. Irizarry testified that the boy on the corner of West 72nd Street was short, light skinned, was wearing blue jeans, white shirt and a blue baseball cap. The boy holding the gun was a little taller, was dressed in all black and wearing a black hat.
 {¶ 7} Irizarry testified that moments later she heard gunshots. Irizarry testified that after she heard the gunshots, she observed the boy who had been standing on the corner and the boy with the gun, fleeing the scene in the direction of West 73rd Street. Irizarry testified that after the shooting, she left the scene, but returned to speak with the police.
 {¶ 8} Jose Quinones testified that on the evening of August 14, 2006, Wheeler came to his house to see him. Quinones testified that Wheeler, who appeared nervous and fidgety, *Page 4 
stated: "New York, I got to get rid of this burner. I just bodied somebody."[1] Quinones explained that people call him New York, that a burner is street slang for a gun, and that "bodied somebody" means to kill them. Quinones testified that he told Wheeler he did not want to be involved in the matter because he had a family.
 {¶ 9} Quinones testified that Wheeler was wearing blue jeans shorts, had on a black hooded sweatshirt and was fumbling with something in the pouch of the sweatshirt. Quinones testified that he did not see the gun, but believed it to be what Wheeler was fumbling with in the sweatshirt. Quinones testified that he was not surprised that Wheeler claimed to have a gun, because he had seen him with a gun in the past, and had also seen him fire a gun during the 4th of July celebrations.
 {¶ 10} Quinones testified that the following day, the victim's brother told him that Anderson had been killed the night before. Quinones testified that he had served time in prison with the victim. Quinones admitted that he has been convicted of burglary, theft and grand larceny. Quinones also admitted that at the time of trial, he had a charge pending.
 {¶ 11} Orlando Bolanos testified that he has been best friends with Wheeler's older brother for about fifteen years, and has known Wheeler for almost as long. Bolanos testified that on August 14, 2006, earlier in the day, he was in the company of Wheeler and co-defendant Victor Mercado. He testified that Wheeler and Mercado were engaged in a *Page 5 
conversation about Mercado being robbed by the victim. Bolanos testified that Wheeler and Mercado asked him to buy some bullets, but he declined and told them he was underage.
 {¶ 12} Bolanos testified that Wheeler and Mercado invited him to drive with them to Parmatown Mall and they were driven there by a drug addict. He stated that they first stopped at Dick's Sporting Goods, where he remained in the car. He also stated that after leaving Dick's Sporting Goods, they traveled to B T Gun Store. Bolanos stated that he went into the store with the others, and the drug addict purchased the bullets, which Bolanos believed to be for a 9-millimeter handgun.
 {¶ 13} Bolanos testified that when they returned to the car, the drug addict gave the bullets to Mercado, who was seated in the back seat with Wheeler. Bolanos stated that he asked them to drop him off at home, because he became concerned that Wheeler and Mercado were going to do something crazy, such as, shoot somebody.
 {¶ 14} Bolanos testified that later that evening, while he was at his girlfriend's house, Wheeler arrived on foot. Bolanos stated that Wheeler indicated that Mercado had just seen Anderson and was going to kill him. Bolanos stated he told Wheeler that he did not want to hear anything about it and went inside the house.
 {¶ 15} Bolanos testified that a few moments later, Wheeler's cell phone rang, he answered it, and immediately took off in the direction of West 73rd Street on a borrowed *Page 6 
mountain bike. Bolanos stated that Wheeler was wearing a white shirt and blue jeans. Bolanos stated that in less than two minutes after Wheeler rode away, he heard gunshots.
 {¶ 16} Bolanos testified that he saw Wheeler later that night. Bolanos stated that Wheeler appeared shocked and indicated that he could not believe that Mercado had killed Anderson. Bolanos stated that he suspected that Wheeler had a gun in his possession when he came to see him later that night. Bolanos testified that two days earlier, he had seen him with what looked like a 9-millimeter handgun.
 {¶ 17} Bolanos testified that the following day, he saw Wheeler, Mercado and a friend named Bud. Bolanos stated that Mercado had the newspaper, which had reported the homicide, and was bragging that he had killed Anderson. Bolanos testified that he gave a statement to the police, and when Wheeler found out, he threatened him with bodily harm. Bolanos stated that he recorded the threats and played it for the police.
 {¶ 18} Detective Kathleen Carlin of the Cleveland Police Department testified that on August 14, 2006, she responded to the scene of the shooting. Detective Carlin testified that she spoke with two eyewitnesses to the shooting, who described the shooter as a Hispanic male between the age of 16 and 18, approximately 5 feet 8 inches and 5 feet 10 inches tall. The eyewitnesses indicated that the shooter was wearing all black.
 {¶ 19} Detective Carlin testified that the eyewitnesses described the second male as a light-skinned Hispanic or white male, shorter in stature than the shooter, and very skinny. *Page 7 
The eyewitnesses indicated that the second male was wearing blue jeans and a white shirt. Detective Carlin testified that as a result of the eyewitnesses' report, Wheeler and Mercado became suspects in Anderson's slaying.
 {¶ 20} Detective Carlin testified that she investigated Bolanos' story about the purchase of the 9-millimeter bullets. Detective Carlin testified that armed with the knowledge that Anderson was killed with a 9-millimeter Lugar handgun, she went to B T Gun Store to investigate. Detective Carlin testified that when she checked with B T Gun Store, they indicated that they did not keep a record of the names of customers who purchased bullets. However, the store confirmed that they sold the type of 9-millimeter bullets that were used in the slaying.
 {¶ 21} Detective Carlin testified that she also investigated Bolanos' story about Wheeler's threats. Detective Carlin testified that she listened to four messages on Bolanos' cell phone, and recognized Wheeler's voice. Detective Carlin added that on the messages, Wheeler identified himself as "Nick."
 {¶ 22} On October 18, 2007, the trial court found Wheeler delinquent of aggravated murder and murder, with one and three-year firearm specifications, as well as the serious youthful offender specification attached. The trial court imposed a juvenile sentence of commitment to the Ohio Department of Youth Services until Wheeler attained the age of *Page 8 
twenty-one. In addition, the trial court imposed a sentence of twenty years to life, plus three years for the firearm specification, to be served consecutively.
 Manifest Weight {¶ 23} In the first assigned error, Wheeler argues his convictions were against the manifest weight of the evidence. We disagree.
 {¶ 24} In State v. Wilson, [2] the Ohio Supreme Court recently addressed the standard of review for a criminal manifest weight challenge, as follows:
 "The criminal manifest-weight-of-the-evidence standard was explained in State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. In Thompkins, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. Id. at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. Id. at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. Id. at 387, 678 N.E.2d 541. `When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony.' Id. at 387, 678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652."
 {¶ 25} However, an appellate court may not merely substitute its view for that of the jury, but must find that "the jury clearly lost its way and created such a manifest miscarriage *Page 9 
of justice that the conviction must be reversed and a new trial ordered."[3] Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction."[4]
 {¶ 26} In the instant case, the trial court found Wheeler guilty of complicity to aggravated murder and murder. R.C. 2903.01(A) defines aggravated murder as follows:
 "No person shall purposely, and with prior calculation and design, cause the death of another * * *."
 {¶ 27} R.C. 2903.02(A) defines murder in pertinent part, that:
 "[n]o person shall purposely cause the death of another * * *."
 "Purposely" is defined in R.C. 2901.22(A):
 "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 28} R.C. 2923.03, which defines "complicity," states in part as follows:
 "(1) Solicit or procure another to commit the offense;
 "(2) Aid or abet another in committing the offense;
 "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;" *Page 10 
 {¶ 29} A defendant's, "[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed."[5] However, mere presence at the scene of a murder is not enough to establish complicity.[6] A defendant must have had some level of participation by way of providing assistance or encouragement.[7] Aiding and abetting includes such things as supporting, assisting, encouraging, cooperating with, advising, or inciting another to commit the underlying offense.[8]
 {¶ 30} In the instant case, the State presented overwhelming evidence of Wheeler's complicity to the aggravated murder and murder of Anderson. The evidence at trial established that there were two eyewitnesses to Anderson's slaying, including Irizarry, whose account and description of the assailants led to the apprehension of Wheeler and Mercado. Irizarry testified that the boy standing on the corner, next to the shooter, was shorter, light skinned, was wearing blue jeans, white shirt and a blue baseball cap. Irizarry *Page 11 
testified that she heard the gunshots and observed the two assailants fleeing in the direction of West 73rd Street.
 {¶ 31} Bolanos' testimony provided the motive for the slaying, as well as Wheeler's involvement and knowledge that Mercado planned to kill Anderson.
 {¶ 32} Bolanos testified that he heard Wheeler and Mercado discussing that Anderson had robbed Mercado. Bolanos testified about being asked to buy bullets; he testified that the crack head bought the bullets and gave it to Mercado; he testified that he believed the bullets were for a 9-millimeter handgun; and he testified that he had seen Wheeler with a 9-millimeter handgun.
 {¶ 33} Bolanos testified that he saw Wheeler immediately before Anderson's slaying, and, at that time, Wheeler indicated that Mercado had just seen Anderson and was going to kill. Bolanos testified that Wheeler's phone rang, he answered it, immediately left, and in less that two minutes, he heard gunshots. Bolanos testified that Wheeler was wearing blue jeans and white shirt, which comports with Irizarry's description.
 {¶ 34} Bolanos also testified about Wheeler's shocked demeanor later that night, when he indicated that he could not believe that Mercado had killed Anderson. Bolanos also testified about seeing Wheeler the next day in the company of Mercado, who was holding the newspaper and bragging about killing Anderson. Bolanos also testified about the threats *Page 12 
Wheeler made when he found out that he had made a statement to the police. The evidence established that Wheeler's threats were recorded and Wheeler identified himself on the calls.
 {¶ 35} Quinones testified that Wheeler came to his house the night of Anderson's slaying, and indicated that he needed to get rid of the gun, because he just killed someone. Quinones testified that he believed that Wheeler had a gun with him, that he had previously seen him with a gun, and had recently seen him firing it during the 4th of July celebrations.
 {¶ 36} Wheeler takes issue with the credibility of Bolanos' and Quinones' testimony based on the fact that Bolanos has twice served time after being adjudicated delinquent, and Quinones has several felony convictions, as well as a pending charge. However, the weight to be given the evidence and the credibility of witnesses are primarily issues for the trier of fact.[9]
 {¶ 37} Moreover, the two disinterested eyewitnesses report and description led the police to Wheeler and Mercado. Both Irizarry and Bolanos testified that Wheeler was wearing blue jeans and a white shirt. Bolanos testified that 9-millimeter bullets were purchased. The evidence indicates that Anderson was killed with a 9-millimeter handgun. Further, the police were able to confirm that the store where Bolanos indicated the bullets were purchased, actually sells those bullets. *Page 13 
 {¶ 38} After reviewing the entire record, weighing the evidence, and considering the credibility of the witnesses, we are not persuaded that the trial court clearly lost its way or created such a miscarriage of justice that Wheeler's convictions must be reversed. Wheeler's convictions were not against the manifest weight of the evidence. Accordingly, we overrule the first assigned error.
 Serious Youth Offender Specification {¶ 39} In the second assigned error, Wheeler argues the trial court erred in adjudicating him a serious youth offender (SYO). We disagree.
 {¶ 40} R.C. 2152.13 allows for a juvenile court to impose a blended sentence upon a "serious youthful offender."[10] A "serious youthful offender" is defined as "a person who is eligible for a mandatory SYO or discretionary SYO but who is not transferred to the adult court under the mandatory or discretionary transfer."[11]
 {¶ 41} R.C. 2152.13(D)(1) involves sentencing of a serious youthful offender. R.C. 2152.13(D)(1) provides:
 "If a child is adjudicated a delinquent child for committing an act under circumstances that require the juvenile court to impose upon the child a serious youthful offender dispositional sentence under section 2152.11 of the Revised Code, all of the following apply: *Page 14 
 "(a) The juvenile court shall impose upon the child a sentence available for the violation, as if the child were an adult, under Chapter 2929 of the Revised Code, except that the juvenile court shall not impose on the child a sentence of death or life imprisonment without parole.
 "(b) The juvenile court also shall impose upon the child one or more traditional juvenile dispositions under sections 2152.16, 2152.19, and 2152.20, and, if applicable, section 2152.17of the Revised Code.
 "(c) The juvenile court shall stay the adult portion of the serious youthful offender dispositional sentence pending the successful completion of the traditional juvenile dispositions imposed."
 {¶ 42} In the instant case, Wheeler argues that the imposition of the serious youth offender sentence violated State v. Foster[12] andBlakely v. Washington[13] because it was based upon judicial fact-finding. We are not persuaded.
 {¶ 43} Initially, we note that Wheeler waived his right to a jury trial. However, there is no federal or state constitutional right to a jury trial in a juvenile-delinquency proceeding and, therefore, the holdings in Foster and Blakely are not applicable.[14] Further, even if there were such a right, once appellant was found guilty of the delinquency charges, he was subject to the serious youth offender disposition sentence.[15] *Page 15 
 {¶ 44} R.C. 2152.13(D)(2)(a) permits the court to exercise its discretion and impose a sentence within the range of punishment applicable to adults under R.C. Chapter 2929 after consideration of the circumstances of the offense and the ability of the juvenile system resources to accomplish the goals of the juvenile justice system in this case.[16] The court's exercise of its discretion and consideration of these factors would not violate appellant's right to a jury trial.[17]
 {¶ 45} In the instant case, the trial court, as the trier of fact, was in the best position to determine the appropriateness of the sentence, based on the facts adduced at trial. As such, the trial court's imposition of the serious youth offender sentence was not unconstitutional. Accordingly, we overrule the second assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence. *Page 16 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the
Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., P.J., and MELODY J. STEWART, J., CONCUR
[1] Tr.38.
[2] 113 Ohio St. 3d 382, 2007-Ohio-2202.
[3] Thompkins, supra at 387.
[4] Id.
[5] State v. Johnson (2001), 93 Ohio St.3d 240, 245, 2001-Ohio-1336, quoting State v. Pruett (1971), 28 Ohio App.2d 29, 34.
[6] State v. Mootispaw (1996), 110 Ohio App.3d 566, 570.
[7] State v. Nievas (1997), 121 Ohio App.3d 451, 456; State v.Sims (1983), 10 Ohio App.3d 56, 58.
[8] Johnson, supra.
[9] State v. Norman, Cuyahoga App. No. 85903, 2005-Ohio-5979, citingState v. DeHass (1996), 10 Ohio St.2d 230.
[10] In re Wells, 3rd Dist. No. 1-05-30,2005-Ohio-6861.
[11] Id., R.C. 2152.02(X).
[12] 109 Ohio St.3d 1, 2006-Ohio-856.
[13] (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L Ed.2d 403.
[14] State v. D.H., 169 Ohio App.3d 798, 2006-Ohio-6953.
[15] In re Lee J., 6thDist. No. S-06-030,2007-Ohio-2400.
[16] Id.
[17] Id., citing In the Matter of Sturm, 4th Dist. No. 05CA35,2006-Ohio-7101. *Page 1